I'll turn to the third case this morning, which is Council. Reggie, here you go. May it please the Court, Joshua Revesz for the United States. The District Court vacated the rules challenged here because it believed that HHS failed to adequately explain why it designed the risk adjustment program to be budget neutral rather than to rely on an outside source of funding. That ruling rests on two basic but related errors. First, because no commenter objected to budget neutrality during the rulemaking processes, plaintiff's challenge to that approach is forfeited. Second, the reason that no one objected to budget neutrality is that all of the sophisticated commenters involved understood that there are important practical reasons the program has to be budget neutral. There's no outside pot of money that could legally and predictably be spent on the risk adjustment program. And even- Define outside source of money. Is there some kind of charitable foundation outside dumping money into New Mexico to help fund this program? No. Unsurprisingly, there's no outside source of money from the government. Now, with the District Court- Well, what do you mean by the government? Is- Are you distinguishing, then, between the government and outside sources, or do you consider the government an outside source? So, the way the program is designed is that it takes money- Don't you mean appropriated funds? Ultimately, I mean appropriated funds, because that's what the District Court decided on. If that's what you mean, let's- I think that makes more sense. Sure, sure. All right. I mean, the way the program works is that it takes money from insurers with populations that are healthier than average, and it gives money to insurers with populations that are less healthy than average. And in that way, it hedges against the risk of adverse selection that became acute after the Affordable Care Act's ban on discrimination against people with preexisting conditions. And even the plaintiff, even the coalition to which the plaintiff belonged, contended in 2015, when this program was actually being designed, that it would be, quote, necessary, quote, to make adjustments so that the program maintained budget neutrality. And again, that makes sense, because there is no other money that can be used. So, maybe I can back up and start with the waiver point, because everyone here agrees that there's no comment in the 2014 rulemaking, the 2015, the 2016, or the 2017 rulemakings that suggests that the agency should not have run this program budget neutrally. Everyone agrees. Well, since you're asking us to reverse the findings of Judge Browning, it might be a good idea for you to tell us where he went wrong. Right. So, Judge Browning. Where is his decision in error? Does it seem to me that the 17 and 18 benefit years perhaps  So, we don't think the 17 and 18 benefit years are moot. It's possible that the 2018 year plaintiffs have abandoned that challenge because they informed this court that there are actually risk adjustments. So, with respect to the 17 and 18 benefit years, are you asking us to reverse or to affirm? We're asking you to reverse the judgment of the district court for all of the benefit years. And the district court... So, you do want us to reverse 17 and 18? We do, to the extent that plaintiffs are still challenged. I guess my question assumes it's because they were moot, and you're saying they're not moot? We don't think they're moot. We think the district court was wrong on forfeiture and wrong on the merits. And the district court acknowledged that there was no comment in the record and acknowledged that ordinarily this case would therefore be forfeited. The district court applied a sua sponte exception announced by this court in the Garcia-Carvajal case, written by then Judge Gorsuch, in which Judge Lucero, you joined. And there's no way to square what the district court thought the agency was doing with this court's actual language in Garcia-Carvajal. This court said the sua sponte exception is rare. It inheres only when an agency identifies an issue, says we are exercising our discretion to consider an issue that no comments were made, and then explains that in a full explanation. Well, isn't that what the agency did? It explained why it was using this formula. It explained the budget neutral. Why isn't that enough to preserve the issue? It explained that it was using the statewide average formula because everything else made budget neutrality more complicated. It never, as the Garcia-Carvajal court requires, clearly identified a claim, issue, or argument not presented by the petitioner. It never explicitly decided that manner in a full explanatory opinion or substantive discussion. And it never demonstrated that the agency chose to exercise its discretion to entertain that manner. And then Judge Gorsuch explained that whenever an agency states a conclusion, it impliedly rejects any number of unmade potential arguments. But that doesn't mean the agency noticed those arguments, let alone considered and rejected them. And the facts supporting that are particularly strong here, where again, everyone involved, including plaintiff's coalition, said budget neutrality would be necessary. So the agency had no reason to think that anyone wanted to do something different until this suit was filed. As soon as it did, it thought there was a question. It explained why it implied budget neutrality. That just wasn't for the first few years in this case. That's absolutely right. When the agency reissued the 2017 and 2018 rules in response to the district court's ruling, someone commented and someone said don't make this program budget neutral. And the agency, and I think this is on A65 of the addendum to Appellee's Brief, gave a page and a half of reasoning and said we can't do it for this reason. We can't do it because there's no funds that at the time we're developing the program is available for use. And that's correct. You know, predictability is such an important part of this program. That's why the agency tries to issue an NPRM about 18 months before the start of the benefit year and tries to finalize that rule about 13 months before the start of the benefit year. And Congress doesn't appropriate money at that point. At the time that the agency is developing its methodology, the agency has no idea whether Congress will appropriate money, how much Congress will appropriate money, what conditions, if any, Congress will put on the appropriation of money. So there is no way to have a predictable methodology that isn't budget neutral. And everyone in the relevant comment periods understood that and that's why this is forfeited. And it's certainly why there's no kind of like. What is the scope of the forfeiture you're arguing here? What exactly is forfeited? The plaintiff's challenges at least to the 2014 through 2017 rules are forfeited. All right, but there's the budget neutral issue and there's the statewide average premium issue. Have they forfeited challenges to both of those together, one or the other? What exactly is? Wasn't there a challenge to the statewide average premium? The case on appeal as now is really just about budget neutrality. Because plaintiffs said below, and this is a comment that they actually made, you shouldn't use the statewide average premium. You should instead use the plan zone premium. And the agency in all of the rules responded, well, we're not going to do that because that would require additional balancing adjustments to ensure budget neutrality. And we think those balancing adjustments would be unpredictable. And the district court rejected all kinds of other arguments against the use of the statewide average premium and rejected other arguments by plaintiffs that have not been cross-appealed to this court. But the district court said the use of the statewide average premium was arbitrary and capricious because it assumed budget neutrality and that assumption was wrong. All right, but it does seem like the district court saw the two as linked, almost interwoven. And so my question is, to the extent you're making a forfeiture argument, is it based on the failure to raise either one of those issues in the early budget years? I think what I would say is the district court thought that the agency gave one reason for preferring the statewide average premium. And that reason was budget neutrality. And the district court thought that that reason was wrong and therefore the state average premium was arbitrary and capricious. Now because that reason is right, it's right both on the merits and it's right as a matter of forfeiture, plaintiffs challenge the statewide average premium fails. Does that answer your question? Well, that sounds more like a merits explanation as opposed to a forfeiture one. If you're saying that reliance on, that the district court was wrong to say that it was error for the agency to think it had to be budget neutral in the design, if you think that's wrong, it sounds like you've reached the merits as opposed to saying we aren't even going to address this because it was never challenged. Didn't the district court say the problem is the agency didn't give an explanation for budget neutrality as opposed to saying its explanation was wrong? Rich, the district court said you assumed that it has to be budget neutral. There might be excellent reasons for budget neutrality. That's in a district court opinion. But none of those reasons were in the rule and therefore because budget neutrality fails. None of the reasons were articulated, not so much in the rule. Isn't that what Judge Browning said? The court, that the agency never gave a policy reason for budget neutrality. That's what Judge Browning said. The agency was under no obligation to give a policy reason for budget neutrality because no one asked it to. And so because the agency was not under the obligation, the agency was well within its rights to state this has to be budget neutral. Everyone agrees on that. And therefore, we're going to do this instead of that. Well, not Judge Browning. Not Judge Browning, but everyone at the time, including plaintiff. Again, you know, at Supplemental Appendix 133, you have the comments by the Choices Coalition. This group of seven or eight co-ops to which plaintiff belonged. And there's a footnote there that says if you do things our way, it would be, quote, necessary, quote, to make adjustments to ensure budget neutrality. So plaintiffs thought that then. And it's only kind of as this lawsuit developed that they've decided that maybe budget neutrality wasn't required after all. And now that they've decided that and they've made that in comments to the agency, as you asked Judge Hartz, the agency has fully explained them. And even Judge Browning acknowledged. Well, let me make sure I understand why you say budget neutrality was required after all. It wasn't required by the ACA itself. It isn't required by statute, correct? It's practically necessary, not just as a matter of. No, no. I'm asking does statute require budget neutrality, yes or no? The text of the ACA alone does not. Okay. And is it correct to say, I think I understand you to be arguing that budget neutrality was required because there was no budget. There was no appropriated funds. Because there's no money that could legally be spent. And that's as a matter of appropriations law, not as a matter of the text of the ACA. Of course, Health Connect argues, and Judge Browning did, too, that there is this lump sum appropriation. Now, why wasn't that available? So we don't think as a legal matter the lump sum appropriation was available, but we don't think the court needs to reach that because as a timing matter the lump sum wasn't available. Appellee makes no dispute of the fact that at the time that the risk-adjustment methodology has to be finalized, the lump sum hasn't been appropriated. And so the agency has no idea whether and on what terms and in what amount the lump sum will be appropriated. And we think that's enough to show that as a practical matter there was no money available when the methodology is set. And if the court has no further questions. I have another question. Assume that we affirm that the APA violation holding here, what are the consequences of vacating for each year or not vacating for each year? This is the vacater issue that was addressed at the end of Judge Browning's opinion and at the end of both briefs. I need a little help in understanding what the fallout is from doing one or the other. And by the way, is there any Tenth Circuit case that specifically speaks to this? No, the Tenth Circuit as far as we can tell has almost no case law on removal of the vacater. And that's why the district court looked at D.C. Circuit cases. In the absence, if the court affirms Judge Browning's remedy, then there'll be no rule for 2014 to 2016. Judge Browning made clear that his ruling does not require the transfer of any money. So no money would automatically transfer. But frankly, we don't know exactly what would happen at that point. And that's why we along with many health insurers participating as amici have asked this court if it is to affirm Judge Browning on the merits to remove the vacater to prevent some potential disruption to the market. And I guess I'll reserve the remainder of my time for rebuttal. May it please the court. Barack Bassman on behalf of Apelli in New Mexico Health Connections. Excuse me. This is a straightforward case under the APA. As relevant to this appeal, New Mexico Health Connections challenged a particular agency action. The decision in making the risk adjustment formula to use the statewide average premium as opposed to each issuer's own average premium. That was a decision the agency actually made before it solicited comments. But they explained why, didn't they? They said that in order to make sure that one risk pool is not adversely affected to vis-a-vis others, that it became necessary to have some kind of a formula along the lines that the rule proposed or the rule required. There had to be a formula, yes. But how you, and this is sort of the decision point they made, how you turn relative risk. So my population of people I insure is healthier, yours is sicker. How do I change those relative risk terms into dollars for charges or payments? That was the key decision point. And they identified two options. You could use the average of all the premiums in the state, sold to everybody, waited. Or you could go insurance company by insurance company and plug in the insurance company's average premium that it was charging. And then arrive at some average thereof. Right. And when looking at that issue in September 2011, the agency put together a white paper that looked at exactly those two options. And in that white paper it said there are several issues particular to the ACA we need to look at, we need to be sensitive to. In contrast to other risk adjustment methodologies, risk adjustment under the ACA is quote unquote designed to be budget neutral. That was the rabbit they put in the hat, that there was a statutory mandate to make the payments in and payments out net to zero. Did they say it was required by statute? Did they ever really say that? They did not, but it's, I'm not sure how else you'd read what designed means there. Well. There's first a discussion. If you don't have any appropriated money, then you've got to design it as if you don't have any appropriated money. Well, the problem is they designed it actually as if they did. And there's something I think that's deeply inaccurate about appropriations law that was in. Well, if they designed it as if they did, then why would they say they designed it to be budget neutral? Here's why, and here's where I think the confusion comes from in a lot of the argument from the government. The payments in under risk adjustment are not automatically available to be used to fund payments out. You pay money to the federal government. Under Article I of the Constitution, Congress has the power of the purse. Congress has to give the executive branch authority to use that money again for any reason, whether it's taxes or whether it's payments into a program. The program management appropriation, which has the lump sum we've been talking about, also has the appropriation for user fees. These are user fees. The GAO opinion on the related risk corridor program talks about this point, I think, very briefly but very eloquently and says a user fee under the law is when you pay the federal government for some benefit that the general public doesn't get. So deposit insurance programs, for example. Or here, market participants are paying for a market stabilization program. Those are user fees. The program management appropriation, besides having the lump sum, is the express authority to spend user fees. The risk corridor program is deeply interrelated with risk adjustment. I think the GAO's analysis there. And again, risk corridor, like risk adjustment, has a scheme of payments in, payments out. Doesn't necessarily say one automatically funds the other. But the user fee appropriation allows the government to do that. Now, the DOJ, in their reply brief, and I'd like just an opportunity to address this point, tries to get around this issue by saying there was a special fund. That the risk adjustment statute establishes this fund that didn't hinge on the annual appropriation cycle that could be used as a kiddie of money. That's not the case. I think the best way the court can see that that's not the case is there are three interrelated market stabilization programs. Can I just ask you, did Judge Browning talk about any of this in his opinion? Yes. I mean, the user fee and the GAO and all of that. Yes. It's in his opinion. He covered all that. All right. Yes. Judge Browning and the motion for reconsideration opinion. Okay. And are you getting to where we have an APA violation? What exactly is the violation after all this? Sure. The violation is the agency decided to use statewide average premium over each issuer's own premium based on the assumption there was a statutory mandate that payments in and payments out net to zero. That's wrong. Council just admitted that is wrong. HHS is not defending that position on appeal. That was the arbitrary and capricious conduct. What the agency did not acknowledge and had to acknowledge, as Judge Browning made clear, is that the agency made the decision this should be a budget neutral program. Not it has to be, but we're deciding it should be. The agency in the administrative record doesn't do the analysis where they say this should be budget neutral. Here's why. They put the rabbit in the hat assuming the statute was designed to require a budget neutral program. That was the APA violation. Let me interrupt you. Here's how I understood what was going on and correct me to the extent I'm missing this. The opposing council has said the statute does not in its own terms require budget neutrality. But the agency has been consistent, has it not, in saying that all things considered, the way this should work is budget neutrality. Is that correct? No. And here's why it's not correct. It actually said during the administrative process that the statute requires budget neutrality. What the agency said was as follows. And its comments are not as articulate as would probably be ideal. When it first developed the formula, it said in a white paper in September 2011, designed to be budget neutral. That was the phrase. And coming up with the first notice of proposed rulemaking when it first published the formula as proposed notice of comment rule for 2014, the agency incorporates the white paper and says it's relying on that analysis. And says if you use issuers' own premiums, a balancing adjustment is quote unquote required. It's only required if you have to make payments in and payments out net to zero. And throughout the administrative process and developing the rules for the prior to 2018, no one challenged in the administrative proceedings the assumption that the program should be budget neutral. Isn't that correct? There was no specific comment on budget neutrality. However, the agency does address itself the action that we're asking to be reviewed. Statewide average premium versus use of each issuer's own premium. And in 2017, there were many challenges to the use of statewide average premium. Before 2017, what the agency did was assumed budget neutrality and no one challenged that. And what Judge Browning did is say you had an obligation to explain that even if it wasn't challenged. Is that correct? I think what Judge Browning did was slightly different. I think what Judge Browning said is that they did explain why there was a budget neutrality assumption and their explanation was arbitrary and capricious because the explanation was there's a statutory requirement for budget neutrality. So there was an affirmative explanation offered by the agency. That affirmative explanation is unsustainable. Thus, the remand. And you have the right to challenge that error, even though it was never challenged in the administrative proceedings? Yes. And the reason we do is that the purpose of the issue exhaustion doctrine is to give the agency an opportunity to address an issue, to exercise its reasoning, to develop a record that can be reviewed under the APA. And that was done here. Well, we have a three-part test that must be satisfied. Would you go through the three steps and show how each one was satisfied here? Okay. So as I recall, step one is the agency identifies the issue. In the September 2011 white paper, the agency identified the issue. It identified the issue of we need to pick between the statewide average premium and each issuer's own premium. No. The issue it would have to have addressed is the need for budget neutrality. And it assumed that. It never addressed whether or not there should be budget neutrality. Once it was clear that that was an issue, I guess in 2017, it explained why there needs to be budget neutrality. And you may disagree with that decision, but it gave its explanation at that point. Is there anything before 2017 that shows that in the agency proceedings, the agency addressed why or whether there should be budget neutrality as opposed to given budget neutrality, this is the way we need to go? I think the place where it addressed it was in the September 2011 white paper with the statement in contrast to other risk adjustment programs, the ACA program is designed to be budget neutral. That was the agency's explanation and where it addressed the point. And okay, now go through the next two steps. The third has to be a thorough discussion of the issue as I recall. So there is a thorough discussion of the issue in the September 2011 white paper, the issue being do you use the statewide average premium each issuer's own premium? But what they didn't address according to Judge Browning was the underlying assumption of budget neutrality. They didn't give a full analysis of that at any time before 2017. No one asked them to, no one objected to the fact that they had. Isn't that the error that, well, what Judge Browning was concerned about was that the agency had not given an explanation. If it had given an explanation, it might have deferred to the agency and said, yeah, that's a good explanation. There's no explanation. The issue was never challenged before the agency. So you have to rely on our precedent saying there's a three-part test for saying, for determining that an issue was exhausted even though no party raised it. And I don't see how that test is satisfied here. If you're focusing on the issue of should there be budget neutrality. So a couple of things in response, Your Honor. First, in terms of whether issue, in terms of the three-part test, we do think the agency discussed, although very brief, very tersely in the early rules that there should be budget neutrality. It viewed it as a statutory requirement. Moreover, there are other exceptions to the issue exhaustion other than the three-part test Your Honor described. In the Zen Magnets case, this court stated that if an issue is obvious to the agency, then there is an obligation to address it, whether a commentator raises it or not. Is that, what do you mean by obvious? It's obvious that here no one complained, no one thought there was an issue regarding the validity of the budget neutrality. What does it mean that the issue is obvious? Obvious as something that needs to be addressed as part of rational rulemaking to create the regulatory structure they're doing, similar to the DC Circuit line of cases around key assumptions in a rule. If an agency is going to engage in rational rulemaking, there are certain pieces of the puzzle it's got to explain along the way. It's somewhat rational, I would presume, that if there is no outside appropriation or outside source of money, that you have to have budget neutrality. Either that or you're running to deficits to the end of time with no way of paying them. Except that that was not true. What do you mean it isn't true? Were there appropriated funds? Yes, there are two sorts, two sets of appropriated funds. They're from. Dedicated to this use. Neither was dedicated to this use. The counsel tells us that there was no appropriated funds available at the time. So this goes back to what I was starting to say to Judge Matheson earlier. I think the way the appropriations discussion is framed by the government is inaccurate and somewhat misleading. The government acts as if the payments into the program were automatically available without an appropriations bill to be used to make payments out. That is not true. The annual program management appropriation, the thing that has the lump sum, the thing that you don't know at the time that you're making the rule whether Congress will enact it again, that also contains the authorization to use user fees. Payments into the risk adjustment program are user fees. If Congress does not give the agency authority to spend them, the agency can't spend them under the Anti-Deficiency Act. They must be appropriated out once they're paid in. Now, Counsel, it seems to me that the word appropriated, the way you're using it, is not the same as when we talk about Congress appropriating funds. Here we're talking about transfers from the insurers into this risk adjustment fund. We're not talking about Congress actually saying we're going to appropriate this amount for this program. I would disagree. I think Your Honor is wrong there. And the use of the term risk adjustment fund that Your Honor has just used is exactly the problem. Can you point to congressional legislation that says we're appropriating funds for the risk adjustment program? Yes. Here's where it is. It's in the annual program management appropriations which we attach to our brief and the statutory attachments. After it says except as otherwise provided, there's a list of appropriated funds. One of those sets of appropriated funds is we appropriate for CMS's use authorized user funds. One second. Just be aware you're out of time. Go ahead and answer the question. Sure. We appropriate authorized user fees. When companies pay money into risk adjustment. Unless Judge Matheson is willing to excuse the clock, I think you've explained this. We'll look at the reference that you're sending. Thank you, Your Honor. Thank you. Add a minute to counsel's time, please. Thank you so much. Just a few quick things. I just thought I would start with the obviousness exception which is a different exception than the three-part test exception. It's true that if there's an obvious flaw in the agency's reasoning, that forfeiture would be excused. But there is no obvious flaw here because, again, it was obvious to everyone at the time, including obvious to plaintiff, that the agency was right. Is there in fact a fund, a real live fund where money goes in and money goes out? You know, I don't know the answer to that, Justice Serrano. Book entries among the different companies. No, I do believe that HHS collects the money from some insurers and pays it out to other insurers. I don't want to say anything about the status of like where that money is kept is. And Congress has said that that's, that they can do that. Congress said they can do that in the Affordable Care Act itself. And we disagree with the plaintiff that this is a user fee. And OMB disagrees with the plaintiff this is a user fee. On page 10 of our reply brief, we cite the OMB budget that describes this. And this is before this litigation is filed. This isn't some sort of post hoc thing. It describes this not as a user fee, but as a special fund. That's because this is different in the risk corridors because the risk adjustment program is operated by HHS on behalf of the states. That's the way the program was designed. Again, we don't think the court needs to get into any of this because we think it was forfeited. And even if it wasn't forfeited, there's no money that was available at the relevant time except for the money in, which HHS knew and could predictably use in any methodology that it developed. It knew that it would be collecting money in from insurers, and it therefore knew that it could spend exactly the same amount of money out on insurers. Let me ask about the obviousness exception. Is it similar to our plain error standard of review? Has any court drawn an analogy there? I don't know that any court. Because for you to say, well, it wasn't obvious to anyone, that's kind of. I don't know that any court has explicitly drawn an analogy. But I guess what I would say, Judge Hartz, is that an agency always has an obligation to promulgate a non-arbitrary rule. If there's some glaring flaw in the agency's analysis, the agency has to address that. You know, if the agency said something that was just plainly wrong, that would, of course, be excused because the agency always acts arbitrarily when there's something that's plainly wrong. Except for those sorts of things, Congress decided that we would rely on commenters to point out flaws in the agency's theories. If any commenter had said the things the plaintiff is now saying in any of the relevant times, the agency could have responded. And it could have responded at length. And it could have responded, as Judge Browning admitted, rationally and correctly. But no one did that. And so there was no basis for HHS to have to explain more, given that this is not an obvious flaw, given that everyone agreed at the time. And if there are no further questions, we would ask this court to reverse the judgment of the district court. Thank you. Thank you. Counsel are excused. The case is submitted. The court will take a 10-minute recess. Thank you.